ATTORNEY-GENERAL *v.* MINISTERS, ELDERS, &c.,
DUTCH REFORMED CHURCH.

*Real Estate—Devise to Church—What Church—How to be used.*

A devise of real property to the only church of the particular denomination named in the will then existing in New York is to be deemed to be a devise to that particular church, and not other churches of the same denomination subsequently established in New York. The devise being for the support of ministers of that particular church—when the income of the property becomes more than sufficient for that purpose, the surplus becomes a fund in the hands of the church to be used by it for any purpose lawful to the corporation.

*P. Y. Cutler* for Appellant.
*D. Lord* for Respondents.

GROVER, J.—This action was instituted by the relator in the name of the Attorney-General, claiming that he, together with all other ministers of the Dutch Reformed Church engaged in ministering to churches in the city of New York, in communion with the Protestant Reformed Dutch Church, are entitled to payment of their salaries in whole or part from the income of property in the hands of Defendants, which property was devised by devise from one Steinwich, by will dated in 1654, and one Hurpendich, by will dated February 7th, 1723, and to enforce such claim by the judgment of the Court. Several questions are presented by the case, which must be considered in its determination. It is claimed on the part of the Plaintiff that the trusts attached to the property by the devisers were to apply the income thereof to the payment of the stipends or salaries of all the ministers officiating in Protestant Dutch Reformed Churches in the city of New York. If this be so, the relator is entitled to the relief demanded, as he shows that, in that case, he belongs to the class of beneficiaries. I shall not discuss the question whether this relief could be obtained in this action, prosecuted in the name of the Attorney-General, or whether it could only be obtained in an action brought by the Plaintiff in his own name as cestui que trust. It is clear

10

that in the latter mode the relator would be entitled, if this position be correct, to the relief prayed for, although difficult to see how the Attorney-General can intervene and maintain an action to procure redress for the relator upon this ground; yet, for the purposes of the inquiry, I shall assume that the action in its present form can be maintained for that purpose.

The inquiry then is, whether the trusts created by the wills were in favor of one particular church now represented by the Defendant, or whether in favor of all the officiating clergy of the denomination from time to time engaged in the city. At the time Steinwich made his will, there was no church or congregation of the denomination incorporated in the city. There was but one such church and congregation in the city. That was unincorporated, and known as the Nether Dutch Church or congregation. Under this state of facts, Steinwich devised the manor of Fordham to the elders or overseers of the Nether Dutch Reformed congregation, within the city of New York, to the proper use and behalf of the minister of the Nether Dutch Reformed congregation, within the city of New York, for the support and maintenance of their minister, ordained according to the church orders of the Netherlands, etc. It will be borne in mind that the question put is not whether the will is valid, or any title acquired by any one under it; but to whom did Steinwich intend to give the property, and upon what trusts. The facts above stated leave no doubt upon this point. He gave it direct to the Nether Dutch Reformed congregation, and there is no more reason to suppose he intended to include the minister of any other congregation of the same, or any other denomination in the city of New York, than that he intended to include those of the mother country. It is clear that if the will, or the deed conveying the property, made pursuant to the directions of the will, conveyed a title, that title and the trust thereby created was acquired by and enured to the benefit of this particular congregation. This fully answers the claim of the relator in this respect; for if no title was acquired by the will or deed, or both, no trust was created, and he has, of course, no claim upon the property or income.

In 1634, this church, still remaining unincorporated, presented a petition to the king for a charter of incorporation, reciting therein their ownership of the manor in question, and certain other real estate, and praying for a confirmation of their title. Upon this petition the king, on the 11th of May of that year, granted to them a charter, whereby, among other things, it was ordained that the then minister, elders, and deacons, and all such others as then were, or thereafter should be, admitted to the communion of the Reformed Protestant Dutch Church in the said city of New York, should from time to time, and at all times forever thereafter, be a body politic and corporate, by the name of the minister, elders, and deacons of the Reformed Protestant Dutch Church of the city of New York, and by the same charter confirmed the title to the real estate unto them, the said minister, elders, and deacons of the Reformed Protestant Dutch Church of the city of New York, and their successors, in trust, for the sole and only use, benefit, and behoof of them, the minister, elders, and deacons, and other members in communion of the said Reformed Dutch Church of New York, and their successors, forever.

A question is made whether this charter incorporated the particular church petitioning for it, or whether it created a denominational corporation, embracing all the churches and congregations of that denomination that might thereafter exist in the city of New York. This question is material, as its determination will also determine in whose favor the trust was created by Hurpendich's will. At the time of presenting the petition of the Nether Church to the king for an incorporation, there was no other church of that denomination in the city. The petition was for the incorporation of this church. There is nothing tending to show that at that time it was in the contemplation of any one that there would thereafter be, in the city of New York, any other organized and incorporated church of the denomination. This particular church desired to be incorporated, to enable it to manage its temporalities. The language of the charter must be construed in the light of the intrinsic facts. An important fact is the peti-

tion that asked for the incorporation of this particular church. This church was known as the only Protestant Dutch Reformed Church in the city. It had an organization conducted upon the basis of churches of this description. Under this state of facts the reasonable presumption is, that any general language used was intended to apply to this church especially, when, as in this case, there is nothing except such general language tending to show that anything more was contemplated. The general language of the charter from which it is attempted to deduce a different conclusion is, all such others as there were, or thereafter should be, admitted to the communion in the Reformed Protestant Dutch Church in the city of New York. It must be considered that this particular church, being at the time the only church of the denomination in the city, there was no way of being admitted to the communion of the church, except by becoming a member of this particular church. Hence, this language appropriately applies to this particular church. Again, it may be remarked that—if the design was to include in the corporation created separate churches and congregations—no mode for the exercise of the corporate powers by such bodies is provided. Upon all the facts my conclusion is, that this particular church alone was incorporated, and that by those in communion with the Protestant Reformed Dutch Church was intended members of this church, as that, at the time, was the mode of being in communion therewith in the city of New York. In February, 1723, Hurpendich willed to the corporation, by name, his interest in the Shoemaker farm, for the payment and satisfying of the yearly stipend, salary, etc., of the respective minister or ministers who, from time to time, and at all times thereafter, should be regularly and legally called to the ministry of the said church, and to no other use whatever. If right in the above conclusion, it follows that, if the will is valid, the title rested in, and the trust enured to the benefit of this church. This renders it necessary to examine various questions ably discussed in the opinion of the Special Term, as we have seen that the only standing ground of the relator is that the title under the will and the trust thereby created is valid. This ren-

ders the question wholly immaterial whether the will is valid under the statute of Elizabeth, or for any other reason or not, because, if valid, the whole beneficial interest vested in this particular church.

There is nothing conflicting with this view in any of the colonial legislative acts, if such acts were competent to modify the title. It will be seen that one of those acts in terms confers power upon the Defendant to apply the income to building or repairing churches, etc. This is what, from time to time, it has done, as the exigencies of their congregation required. When that became too large to be accommodated in one edifice, they have from time to time erected others—governing all by the same officers, as one church, preserving all in the same corporation. It is not claimed but that it might lawfully do this with its own property; but it is claimed that it is a breach of trust to apply the income in question to any other purpose than the payment of ministers, and that, therefore, the Court should interpose by restraining any such application, whether the relator, and those similarly situated, have any interest or not. This brings us to what I regard as the only remaining question in the case necessary to determine.

The case shows that the income largely exceeds what is necessary to pay the ministers employed by Defendant, in full; and the question is, who shall determine what disposition shall be made of this surplus? The Plaintiff's counsel insists that it is the duty of the Court to do this; that the property was, by the devisers, devoted to the payment of the salaries of ministers, and cannot, therefore, be appropriated by Defendants to any other object. It is therefore insisted that although it should be held that the trusts did not extend to the relator, yet the Court should have proceeded to devise a scheme, as nearly pursuant to the intention of the testators as possible, to which this surplus should be applied. The counsel suggests that, as the testators made express provision for the support of preaching only of the particular denomination, it would accord with their intention to apply this surplus to the payment of all the salaries of all the ministers of the denomination employed in the city of New York. Numer-

ous authorities are cited by the counsel, which show that the Court of Chancery in England has, in numerous instances, acted upon the principle, that when charitable bequests were made, or provision for charity made in any other way, the Court would supply almost any defect in the instrument making the provision, or remove any other difficulty in carrying out the design of the donor. In many of the cases the Court has revised almost the entire scheme, and the donor would hardly be able to recognize in it any analogy to his design. This doctrine had its origin in the strong desire of the ecclesiastical chancellors to uphold every gift to the church, and every act that subjected property to its control. At this day, I apprehend, the courts of this State will content themselves with carrying into effect the intention of donors, when found intelligently expressed, and to accord with the rules of law; that if there is any substantial defect in the instrument the Court will not supply it, but the scheme will fail, and the property descend according to law.

In this case the property was devised to the Defendants, and, so far as the parties now are concerned, it must be held that it has the legal title. That title is charged with a trust, of which the Defendant is the sole beneficiary. That trust is fully discharged. It turns out, doubtless, contrary to the expectations of the donor, that, by the rise in the value of real estate, after a great lapse of time, there is a large surplus. When the property was given it would hardly pay one minister. The income now pays four, and leaves an annual surplus of seventy thousand dollars. This surplus, after the entire satisfaction of the trust charged upon the property, I think, follows the legal title, and therefore belongs to the Defendants, not charged with any special trust, but to be used for any of the purposes authorized by the corporation. This is precisely what the Defendants have done, and profess to do hereafter.

The judgment dismissing the complaint should be affirmed.

Affirmed.

JOEL TIFFANY,
State Reporter.